**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

UNITED STATES OF AMERICA

               Plaintiff,

    vs.

JOSE MANUEL NOYOLA-
MARTINEZ,

             Defendant.

3:10-cr-123-HRH -JDR

**<u>RECOMMENDATION
REGARDING
MOTIONS TO SUPPRESS</u>**
(Docket Nos. 19, 21)

      Defendant **Jose Manuel Noyola-Martinez** moves to suppress evidence seized from the kitchen, living room area and bedroom "No. 2" of 3106 West 33rd Avenue, Apt 1 on September 16, 2010, as well as statements made by him to law enforcement officers on September 18, 2010. Dockets 19 and 21. The motions are opposed by the government. Dockets 25 and 24 respectively. An evidentiary hearing was conducted on February 4, 2011 before the magistrate judge. Upon due consideration of the evidence adduced and arguments of counsel and memoranda

the magistrate judge recommends that the motions to suppress be denied except as to the defendant's suitcase in bedroom No. 2.

## Findings of Fact

### A.    Background

On September 10, 2010,  officers were conducting surveillance at 3106 W. 33rd Ave. They observed Jesus Ayalacoria and an unknown individual (later identified as Noyola-Martinez) leaving Ayalacoria's pick up truck carrying a white box and then walking into the entrance of the apartment complex.  The drug investigation on that day involved an investigation of individuals named Enrique Zermeno and Jesus Ayalacoria.

### B.    Traffic Stop

Ty Bishop, Special Agent with Homeland Security Investigations, (SA Bishop) responded to a traffic stop by Anchorage police on September 16, 2010, where he first encountered Mr. Noyola-Martinez.  The vehicle had been stopped for excessive speed and excessive window tint.   There were two occupants in the vehicle. The driver of the vehicle was Enrique Zermeno.  The passenger did not speak English and had Mexican identification.  The passenger was Noyola-Martinez and SA Bishop was asked to speak to Noyola-Martinez in Spanish.

Guy Tavoliero is a special agent (SA Tavoliero) with Homeland Security Investigations (HSI (formerly known as ICE)).  He was called to the scene of the

vehicle stop. The first time SA Tavoliero heard the name Noyola-Martinez was after the search was conducted on September 16, 2010.

Zermeno appeared to be very cooperative. He consented to a search of his vehicle which turned up no contraband. Just before the vehicle search began, Zermeno informed the officers that he had a substance abuse problem with cocaine and marijuana. He was then asked by SA Guy Tavoliero if he would consent to a search of his residence. Zermeno said he would give his consent if he could be present. Zermeno identified his residence as 3106 W 33rd Apt 1. The written consent did not address whether there were any other persons staying in the apartment. There were no limitations as to location within the apartment stated in the consent to search. There was no mention about any other person using his apartment. Zermeno signed a consent form.

After determining that they could understand one another SA Bishop ascertained Noyola-Martinez's citizenship. Noyola-Martinez had with him a Mexican passport and a fradulent Arizona drivers license in someone else's name. Noyola-Martinez was forthcoming and told him that he was in the United States illegally. Based upon this response Noyola-Martinez was taken into administrative custody. He was transported to an office on 10th and Gamble.

//

//

### C.    First Interrogation of Noyola-Martinez

After taking the defendant's fingerprints SA Bishop conducted an interview in Spanish. The agent advised Noyola-Martinez of his <u>Miranda</u> rights using a <u>Miranda</u> card in Spanish which the officer read to Noyola-Martinez line by line, asking him after each sentence if he understood that right. At no time did Noyola-Martinez indicate that he did not understand what was being said. Noyola-Martinez indicated that he understood "perfectly," and that he was willing to waive the rights and speak with SA Bishop. The interview focused on immigration questions. There was no discussion about any sort of involvement with drugs.

### D.    Second Interrogation of Noyola-Martinez

On September 18, 2010, SA Bishop was again present when Noyola-Martinez was interviewed by Anchorage Police Detective Ramon Dojaque and SA Guy Tavoliero. SA Tavoliero identified himself and displayed his credentials. Tavoliero's credentials state that he is a Special Agent with Immigration and Customs Enforcement under the Department of Homeland Security. The credentials do not suggest that the officer participates in any drug investigations. That interview also took place at the Michael Building office on 10th and Gamble. Detective Ramon Dojaque is a Native Spanish speaker. Once again Noyola-Martinez was advised of his <u>Miranda</u> rights by Detective Dojaque. Noyola-Martinez indicated he understood those rights and he did not have a problem talking to the officers confronting him.

This interview lasted just over an hour. The agents did not tell Noyola-Martinez what the questions were going to be about nor did Noyola-Martinez inquire. One of the rights advised Noyola-Martinez was that he could terminate the interview at any time if he wanted to. The interview was not recorded. Noyola-Martinez did not ask to end the questioning.

On September 18, SA Tavoliero wanted to determine the relationship between Ayalacoria and Zermeno. SA Tavoliero asked Noyola-Martinez about his relationship with those two individuals and how long he had been associated with them. Noyola-Martinez indicated that he alternated between staying in Ayalacoria's apartment and Zermeno's apartment. He said that Zermeno sold cocaine and marijuana in the room identified as bedroom No. 2. SA Tavolario was not aware on September 18 that Noyola-Martinez had been with Mr. Ayalacoria on September 15 when a box was brought to 3106 W. 33rd.

### E. Search of Apartment No. 1

On September 16, 2010 the agents transported Zermeno to his apartment. SA Calderon, with the Internal Revenue Service Criminal Investigation Division, waited with Zermeno while SA Tavoliero did a protective sweep in the apartment.

The apartment is located in a multi-unit building. Apartment No.1 had two bedrooms. SA Tavoliero asked Zermeno if there were any controlled

substances in his apartment and he indicated that there was marijuana and cocaine in his bedroom. Tavoliero asked Zermeno where he kept his controlled substances in his apartment. Zermeno directed him to bedroom No. 1.

SA Tavoliero proceeded first to bedroom No. 1 where he found about 13 grams of cocaine, an electronic scale, a pump shot gun, a small quantity of marijuana and other paraphernalia. Zermeno denied selling methamphetamine and cocaine but said he sold quantities of marijuana. Zermeno was taken into custody for violation of the drug laws. Zermeno was told that the officers would secure the door to Apartment No. 1 and not leave it open when they left.

Meanwhile officers were executing a search warrant for Mr. Ayalacoria's apartment downstairs in Apartment No. 4.[1] The search of Apartment 4 (Ayalacoria's apartment) revealed marijuana and methamphetamine.

Zermeno understood that the search of his apartment would continue while he was escorted to a police vehicle. At no time did Zermeno seek to revoke his consent to search or limit it in anyway. Agents moved from searching Apartment No.4 up to Apartment No. 1 to complete the consent search of Zermeno's apartment.

There was nothing readily visible in Apartment No. 1 that alerted SA Tavoliero that there was more than one person living in the apartment. SA Tavoliero believed that he asked Zermeno who had access and Zermeno did not indicate

---

[1] Case No. 3:10-mj-118-JDR.

anyone did.  SA Tavoliero did not ask Zermeno anything about apartment No. 4. Zermeno did not ask the agent any questions nor did he volunteer any information about anyone living with him.

Jason Sherman is a Special Agent with the Bureau of Alcohol, Tobacco and Firearms and Explosives.  He assisted in the ongoing drug investigation.  He took photographs of the apartment during the execution of the consent search. Throughout the apartment the officers found a lot of paperwork with Zermeno's name on.  He observed that the larger bedroom (designated No. 1) had a person's belongings spread throughout the room visibly indicating that the room was lived in. This bedroom had a photograph of Zermeno, his daughter and his wife.  The bed looked like someone had just gotten out of it.  There were a lot of clothes in the closet and in the drawers of the dresser.  There was no indication in the apartment that Zermeno's wife or a female lived in the apartment.

In contrast, the second bedroom had no pictures on the walls or decorations.  The bed was completely made and the closet was blocked off by a large TV armoire.  It looked like a catch all room.  This smaller bedroom (designated No. 2) seemed to SA Sherman more like a multi purpose room containing an "Eclectic gathering of things."  It had a bed and bureau or desk with a laptop on it. SA Sherman saw no visible indication on the second bedroom that it was being

occupied by anyone as a bedroom. He testified that this room could be used as a guest bedroom but It appeared that it was being used as a storage room.

The laptop computer was in the corner of the second bedroom. The name on the computer was "Borrego." In the desk the agents found some cocaine. On the TV stand they observed a wad of money and next to that a stack of money that was rubber banded together.[2] Next to that was an object wrapped in tin foil. The TV stand was placed in front of the closet and the closet doors were somewhat opened. Visible were tools and an old shirt hanging up as well as a white box. The tools were those that would be used by a painter and Zermeno was reported to have been employed as a painter. The box contained gallon size bags of marijuana.

The agent found a suitcase in the second bedroom that contained a stack of bills held together by rubber bands, some deodorant and face cream. A similar type of suitcase was located in Zermeno's bedroom. The suitcase in the second bedroom had no baggage tag. When the agent first opened a pocket to the suitcase revealing the money they did not come across the name Noyola-Martinez on anything. In the main storage area of the suitcase they did locate a Mexican ID card with the name Jose Manual Noyola-Martinez. One inside pocket of the suitcase contained socks and underwear.

---

[2] At the suppression hearing Noyola-Martinez identified currency found in bedroom No. 2 as belonging to Zermeno.

At the suppression hearing Noyola-Martinez testified that Zermeno lived in one bedroom of Apartment No. 1 and a friend of his by the name of "Loter" (ph) lived in the other bedroom. He testified that he had slept in that second room for two nights before his arrest. He stated Zermeno told him he could sleep there while "Loter" was in the process of removing all his things from that bedroom. Prior to those two nights he had been sleeping on a sofa in the living room at Apartment No. 1. On two or three occasions during this time he had slept at Borrego's when Zermeno had parties at his place.

The second bedroom did not have a key lock on it and the door was opened during the day time and only partially closed at night. Noyola-Martinez admitted that Zermeno would just walk into the room when he wanted to during the daytime. Noyola-Martinez did not pay any monies to stay in the apartment. His name was not on the lease.

When asked about his expectation of privacy in the bedroom by his own attorney he responded "Well, I had only been there for two nights so I wasn't expecting much of privacy. For the 15th -- with -- sorry. For the 50 previous days I was sleeping in the living room so I couldn't expect to have any privacy. . . . . [A]ll I did in that bedroom was sleep . . . . I never saw that room as my living quarters ." Tr. 19. He added that he had moved into that room because Zermeno's friends would come over and he didn't want to be a burden. He admitted that he had no

clothes hanging in the closet and that his suitcase did not have a name tag on it. During his interviews Noyola-Martinez never told the agents that he lived in Zermeno's apartment although he did tell them that he had seen drugs used in the second bedroom.

## Conclusions of Law

### A.    Statements of Defendant

Pursuant to Miranda v. Arizona, 384 U.S. 436 (1966) and Rhode Island v. Innis, 446 U.S. 291, 300 (1980) a person must be advised of his Miranda rights whenever he is subjected to custodial interrogation.   The motion to suppress statements was predicated upon the claim that the discovery from the government did not inform the defense what was said to the defendant to obtain his waiver of his Miranda rights.

Noyola-Martinez was advised of his Miranda rights in Spanish by SA Bishop on September 16, 2010,  prior to being questioned regarding his immigration status and  again by Agent Dojaque in Spanish before being questioned on September 18, 2010 about possible involvement in illicit drugs.   The Miranda advisements were read to the defendant in Spanish from cards carried by the agents who carefully went over each advisement line by line asking the defendant if he

Case 3:10-cr-00123-HRH   Document 39   Filed 02/22/11   Page 10 of 22

understood what was said. The advisements complied with <u>Miranda v. Arizona</u>, <u>supra</u> and its progeny.[3]

A waiver of Fifth Amendment rights must be the "product of a free and deliberate choice rather than intimidation, coercion, or deception" and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986). If the government establishes that a <u>Miranda</u> warning was given and that it was understood by the suspect, the suspect's uncoerced statement establishes an implied waiver. <u>Berghuis v. Thompkins</u>, 130 S.Ct. 2250 (2010).

Noyola-Martinez is a citizen of Mexico and the second interview took place entirely in Spanish. The courts accepts the testimony of Ramon Dojaque, Anchorage Police Detective, who read the <u>Miranda</u> rights to the defendant in Spanish from a card (Exhibit 2). Detective Dojaque testified that the defendant stated that he understood his rights and was willing to speak to him. At no time did the defendant say he did not understand what was being spoken. The interview lasted about one hour and the defendant was in custody.

The defendant was not told what questions would be asked before he was asked if he waived his <u>Miranda</u> rights. The detective told the defendant who he

---

[3] The <u>Miranda</u> advisement cards in both English and Spanish used by the agents were received in evidence as Government's Exhibits 1 and 2.

worked for and that he could terminate the interview at any time. The defendant argues that his waiver of Miranda rights was not voluntary because he was not advised in advance of the topics for which he would be questioned. He had previously been questioned about his illegal status in the United States and knew that he was facing deportation charges. He was questioned by SA Tavoliero about his possible involvement with illicit drugs. The interview took place in the same location -- the Office of Homeland Security. He was asked interviewed about his association with Enrique Zermeno and Jesus Ayalacoria. All of the questions asked by SA Tavoliero were translated into Spanish by either SA Ty Bishop or Detective Dojaque.

A suspect may implicitly waive his rights by answering an officer's question(s) after receiving Miranda warnings. Terrovona v. Kincheloe, 912 F.2d 1176, 1179-80 (9th Cir. 1990). Whether the waiver is valid depends upon the totality of circumstances including the background, experience and conduct of the defendant. United States v. Doe, 155 F.3d 1070, 1074 (9th Cir. 1998)(en banc). "A waiver is knowing and intelligent if, under the totality of the circumstances, it is made with a 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" Doe, supra at 1074, quoting Moran v. Burbine, 475 U.S. at 421. The waiver is voluntary if under the totality of the

Case 3:10-cr-00123-HRH   Document 39   Filed 02/22/11   Page 12 of 22

circumstances the statements were the product of a free and deliberate choice rather than coercion or improper inducement. Doe, supra at 1074.

The defendant cites no case authority requiring the government to advise a suspect in advance of the topics of inquiry prior to obtaining a valid waiver of Miranda rights. The purpose of Miranda is to advise the suspect that he is not required to submit to interrogation, that he may have an attorney present if he chooses and that he can stop the questioning at any time. Noyola-Martinez was told that he could stop the questioning at anytime. The Miranda advisement specifically advised Noyola-Martinez that he had the right to remain silent and that he could decide at any time to exercise his rights and not answer any questions or make any statements.

The defendant was specifically asked if he understood the rights that were explained. He was asked, having those rights in mind, if he was willing to talk to the government agents at that time. At no time during the questioning did the defendant seek to limit the questioning or decline to answer any further questions. Nor did he seek to withdraw any of his consent previously given as the questioning proceeded. Nothing about the manner in which the interrogation took place suggests that it was coercive or unfair to the defendant. Noyola-Martinez was not misled by the agents as to the focus of interrogation. The defendant has not shown a need to add to the Miranda warnings an advisement of the topic of questions to be

asked or the crimes being investigated as a prerequisite to obtaining a valid waiver. The waiver of Noyola-Martinez's <u>Miranda</u> rights was made knowingly, voluntarily, and intelligently. The motion to suppress statements is without merit and should be denied.

### B.    Evidence Seized From 3106 W. 33rd Avenue, Apt No. 1

#### 1.  Standing

In order to claim the protection of the Fourth Amendment a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. <u>Minnesota v. Carter</u>, 525 U.S. 83, 88 (1998); <u>Rakas v. Illinois</u>, 439 U.S. 128, 143 (1978). At the evidentiary hearing the magistrate judge accepted the evidence that Noyola-Martinez had been an overnight guest in Apartment No. 1 to afford him standing to move to suppress the evidence seized from that apartment. See <u>Mancusi v. DeForte</u>, 392 U.S. 364 (1968) and <u>Minnesota v. Olson</u>, 495 U.S. 91 (1990).

#### 2.  Consent Search

The evidence seized from the search that took place at Apartment No. 1 at 3106 W. 33rd Avenue on September 16, 2010 was done without a search warrant. The government relies upon the consent of Enrique Zermeno obtained from Zermeno after a traffic stop in which Zermeno was the driver and Noyola-Martinez was the passenger.    During the search of the vehicle conducted by Agents

Tavoliero and Calderon, Zermeno told the officers that he used marijuana and cocaine. SA Tavoliero asked Zermeno for consent to search his residence. Zermeno consented with the stipulation that he be present during the search. Zermeno signed a voluntary consent form prepared by SA Calderon.

About 1:30 PM the agents arrived at Zermeno's residence. The apartment was cleared and Zermeno identified his bedroom telling the agents where to look for cocaine. SA Tavoliero found cocaine in bedroom No. 1, and Zermeno was arrested. A search team that was executing a federal search warrant at Apartment No. 4 at 3106 33rd Avenue continued the search of Apartment No. 1.

Officers found in the smaller bedroom cocaine, a digital scale, marijuana, and a wad of cash wrapped in tin foil. Found in the same bedroom was a suitcase containing cash, cell phones and documents relating to Noyola-Martinez including a photo identification belonging Noyola-Martinez. Found in the kitchen/living room area of that apartment was marijuana, a digital scale and various drug paraphernalia.

The defendant argues that when conducting a consent search the officers have a duty to determine what areas of a place to be search are subject to a claim of a privacy interest by someone other than the person who consented to the search. He argues that under the circumstances in this case the law enforcement agents should have asked Zermeno whether anyone else lived in his apartment, and

inquired into the ownership, possession or control of each item or room sought to be searched.

Initially the circumstances gave rise to the reasonable belief that the entire apartment belonged to Zermeno and was under his control. The police had not seen Noyola-Martinez enter Apartment No. 1. The protective sweep in the presence of Zermeno aroused no reasonable suspicion that there was a house guest who had only stayed there the previous two nights. Zermeno made no mention of a house guest.

When law enforcement officers have no reason to suspect a second tenant living in the residence, they may take an unqualified consent to search as to items there at face value. The consent form authorized the officers to conduct a complete search of Apartment No. 1 at 3106 W. 33rd Avenue. It specifically authorized the agents to take any "letters, papers, materials or any other items of property" found there. The agents found no visible indicia that anybody else was occupying that apartment. The presence of a guest room does not mean that it is being used.

Zermeno stored items in the second bedroom. Zermeno freely entered that room during the daytimes. The suitcase in that room was similar to a suitcase observed in the apartment and bore no tag suggesting an overnight guest. Noyola-Martinez contests the validity of the third party consent given by Zermeno to search

the room in which he had stayed as an overnight guest. In United States v. Matlock, 415 U.S. 164 (1974) the Supreme Court reiterated that a warrantless entry and search by law enforcement officers does not violate a Fourth Amendment prescription of "unreasonable searches and seizures" if the officers have obtained the consent of a third party who possess common authority over the premises. The court stated in Matlock supra at 171, n.7., "[c]ommon authority" rests "on mutual use of the property by persons generally having joint access or control for most purposes. . . ." The government bears the burden of establishing that common authority.

Here, the government established Zermeno's use, access and control over the second bedroom for purposes of authority to consent to a search of that location. Noyola-Martinez did not enjoy exclusive control over the bedroom. Rodriguez explained that the fourth Amendment assures not that no government search of one's abode will occur unless he consents but that no such search will occur that is "unreasonable." 497 U.S. at 183-184. The exclusionary rule protects against introduction of evidence seized in violation of the Fourth Amendment.

The search of the closet in the second bedroom by the officers did not violate Noyola-Martinez Fourth Amendment right. Rodriguez cites Maryland v. Garrison, 480 U.S. 79 (1987) wherein a warrant supported by probable cause with respect to one apartment was erroneously issued for an entire floor that was divided

into two apartments. The Supreme Court upheld the search of the apartment not properly covered by the warrant. In upholding the validity of the search the court explained that it depended on whether the officers failure to realize the over breath of the warrant was objectively understandable and reasonable. In Garrison the court found that the objective facts available to the officers at the time suggested no distinction between the suspects apartment and the third floor premises. Garrison, supra at 88. I conclude that the defendant has failed to show that the officers exceeded the scope of the written consent by searching each room in the apartment. The officers justifiably relied on Zermeno's apparent authority to search the entire residence.

## The Defendant's Suitcase

The search of the suitcase in the second bedroom raises a different concern. Courts have recognized that a suitcase is a type of container long associated with privacy expectations. See for example United States v. Silenios-Cano, 959 F.2d 861, 865 (10th cir. 1992). That case involved a defendant who had left his clothes in a suitcase at his girlfriends apartment. Professor LaFave characterizes an overnight bag or suitcase brought to the premises by an overnight guest a deserving of a high degree of privacy. See 4 Wayne R. LaFave, Search and Seizure, § 8.5(d), at 231 (4th Ed. 2004).

Based on the evidence at the evidentiary hearing Noyola-Martinez had a reasonable expectation of privacy in his closed suitcase which was located in the second bedroom at Zermeno's apartment. Zermeno did not have actual authority to grant consent to allow the agents to search Noyola-Martinez's suitcase. The evidence does not show that Zermeno had any common authority over the suitcase.

Zermeno's consent to search his home was not necessarily consent to search a closed object within the home. In United States v. Matlock, 415 U.S. 164, 171-72 (1974), the Supreme Court held that when the government seeks to justify a warrantless search by proof of voluntary consent, in the absence of proof that consent was given by the property owner, it "may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premisses or effects sought to be inspected." Common authority here refers to mutual use of the property by a person generally having joint access or control for most purposes. Zermeno's consent to search his residence was sufficient to allow a search of all the rooms based on the doctrine of common authority. The United States cites no authority approving a search of a closed container and the consequence of a general consent to enter the room in which it was found. The burden of establishing the effectiveness of a third party's consent is upon the government. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990).

Although Zermeno did not have a common authority to grant permission to search Noyola-Martinez's suitcase the court examines whether the officers were justified in relying upon Zermeno's apparent authority. "When one person consents to a search of property owned by another, the consent is valid if 'the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consent party has authority over the premises.'" United States v. Jenkins, 92 F.3d 430, 436 (6th Cir. 1996). The court must examine the surrounding circumstances to determine whether the facts presented at the time of the search would "warrant a man of reasonable caution" to believe that Zermeno had common authority over the property.

It seems clear that a reasonable officer would have found ambiguity in the ownership of the suitcase and in Zermeno's common authority to consent to the search of it upon finding in the suitcase Noyola-Martinez's Mexican identification. This ID was found when the agent opened the suitcase itself. Tr. 115. Faced with the ambiguous situation the agent proceeded with the search without making further inquiry.

Had the officers kept Zermeno at the apartment during the balance of the search they could have easily made inquiry of him as to the ownership or his interest in the suitcase. Even after Zermeno had been removed from the premises they could have sought his clarification since he was in their custody.

Although SA Sherman may not have known the name "Noyola-Martinez" prior to the search of the suitcase, other officers certainly did as the defendant had been arrested several days earlier at the traffic stop, Moreover, the agent who obtained the consent from Zermeno was the agent who had taken Noyola-Martinez into custody. See United States v. Waller, supra and cases discussed therein about an officer's duty to inquiry in ambiguous situations.

The government may argue that when Noyola-Martinez's ID was found in the suitcase they had already discovered a wad of cash in one of the side pockets of the suitcase. The money was the first item found in the suitcase. Tr. 114. Currency itself is not contraband. Before the officer seized this currency they should have sought to resolve the ambiguous situation or sought a separate search warrant. Therefore, this court should hold that the agents' warrantless entry into Noyola-Martinez's suitcase without further inquiry was unlawful under the Fourth Amendment. Evidence seized from the suitcase should be suppressed. IT IS SO RECOMMENDED. In all other respects the motions to suppress should be denied.

DATED this 22nd day of February, 2011, at Anchorage, Alaska.

  /s/ John D. Roberts
JOHN D. ROBERTS
United States Magistrate Judge

Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than **NOON on 2/28/2011**. The failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. McCall v. Andrus, 628 F.2d 1185, 1187-1189 (9th Cir.), cert. denied, 450 U.S. 996 (1981). The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation United States v. Howell, 231 F.3d 615 (9th Cir. 2000). Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support. Response(s) to the objections shall be filed on or before **NOON 3/7/2011**. The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).

Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment. See Hilliard v. Kincheloe, 796 F.2d 308 (9th Cir. 1986).